**Ravell SUMLER, Plaintiff,**

v.

**Otis R. BOWEN,\* Secretary of Health and Human Services, Defendant.**

**No. 84–1045.**

United States District Court,
W.D. Arkansas,
El Dorado Division.

Feb. 19, 1987.
Supplemental Memorandum Opinion
March 26, 1987.

---

\* Otis R. Bowen succeeded Margaret M. Heckler as Secretary of Health and Human Services on December 13, 1985.—Pursuant to Fed.R.Civ.P. 25(d)(1), his name has been substituted for hers as defendant in this suit.

Denver L. Thornton, El Dorado, Ark., for plaintiff.

Larry R. McCord, Asst. U.S. Atty., Ft. Smith, Ark., for defendant.

## MEMORANDUM AND ORDERS

JOHN W. OLIVER, Senior District Judge.

Plaintiff filed her complaint in the Western District of Arkansas on April 3, 1984, appealing the ALJ's denial of Social Security benefits. The ALJ's denial of benefits was affirmed by the Appeals Council of the Social Security Administration on March 28, 1984, and it is therefore a final decision of the Secretary of Health and Human Services (Secretary). The case is decided by the undersigned Senior United States District Judge pursuant to Chief Judge Lay's January 30, 1987 designation to sit in the Western District of Arkansas. Federal jurisdiction is exercised pursuant to 42 U.S.C. § 405(g).

We have reviewed the pleadings and the transcript of the administrative hearing and we find and conclude that the final decision of the Secretary denying Social Security benefits to the claimant must be reversed outright.[1]

---

1. Claimant's counsel filed a motion to remand on May 1, 1984. That motion is mooted by the decision rendered in this case. Claimant's motion to remand, and whether claimant's counsel may be awarded attorney's fees under either 42 U.S.C. § 406 or 28 U.S.C. § 2412 (Equal Access to Justice Act) will be discussed in part IV of this memorandum opinion.

## I.

The record establishes that on November 23, 1982, claimant applied for disability insurance benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423. (Tr. 64–67). Claimant's application was denied on January 10, 1983. (Tr. 68). Claimant filed a request for reconsideration on January 20, 1983. (Tr. 70). Her request for reconsideration was denied on January 25, 1983. (Tr. 71).

Claimant requested a hearing before an Administrative Law Judge (ALJ) on February 28, 1983. (Tr. 33). A hearing was held on April 19, 1983. Claimant was represented at that hearing by James J. Callaway, an attorney who practices in El Dorado, Arkansas. On October 19, 1983, the ALJ issued his decision denying benefits and so advised the claimant and Mr. Callaway. (Tr. 12–17). On December 20, 1983, Denver L. Thornton, another attorney who practices in El Dorado, noticed an appeal on behalf of the claimant for "a hearing at the next level." [2] (Tr. 10). The Appeals Council denied the request for review on March 28, 1984. (Tr. 3).

Claimant's complaint was filed by Mr. Thornton on April 3, 1984. On May 1, 1984, Mr. Thornton filed the motion to remand which we will discuss in part IV, *infra.* The Secretary thereafter filed an answer on June 20, 1984, together with a certified copy of the hearing transcript.

The case pends on the Secretary's motion for summary judgment filed August 26, 1985. Claimant's counsel failed to file either a brief in opposition to the Secretary's motion for summary judgment, a cross-motion for summary judgment, or any other pleading in support of claimant's position.

We have carefully considered whether an order should be entered that would require claimant's counsel to fully discharge the professional responsibilities to his client and to this Court which he assumed when he filed the complaint in this case. We have concluded that such order should not be entered in light of the inordinate delay that the claimant has already suffered in receiving the benefits to which she is clearly entitled.

For the Eighth Circuit's settled rules of decision in this area of the law are well established.[3] Accordingly, and in order to prevent further delay, we will rule the merits of this case without requiring further filings.

## II.

The final decision of the Secretary must be affirmed if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Cook v. Bowen, supra,* 797 F.2d at 690; *Clark v. Heckler,* 733 F.2d 65, 68 (8th Cir.1984); *Tome v. Schweiker,* 724 F.2d 711, 713 (8th Cir.1984). Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). The applicable standard of review provides for more than a rubber

---

**2.** Claimant's formal appointment of Mr. Thornton as her representative was not executed until December 26, 1983 and Mr. Thornton did not accept that appointment until December 28, 1983. (Tr. 6).

**3.** As the Eighth Circuit's most recent example shows, the court is charged to conduct a "careful review of the record" to determine whether there is "substantial evidence to support the Secretary's decision" denying benefits. *Santifer v. Secretary of Health and Human Services,* No. 86–1283, slip op. Jan. 29, 1987 [815 F.2d 711 (table)]. In *Santifer,* an appeal from the Western District of Arkansas, the Circuit Court held, per curiam, that the record in that case justified outright reversal where claimant suffered from a variety of physical injuries and psychological disorders. *See also Smith v. Heckler,* 735 F.2d

312, 319 (8th Cir.1984) (outright reversal is appropriate where "substantial evidence overwhelmingly demonstrates that [claimant] is disabled"); *Spencer v. Bowen,* 798 F.2d 275 (8th Cir.1986) (outright reversal where finding of disability not supported by substantial evidence and the ALJ improperly relied on the medical-vocational guidelines in determining that claimant was not disabled); *Cook v. Bowen,* 797 F.2d 687 (8th Cir.1986) (outright reversal appropriate for ALJ's failure to find that claimant's impairments meet or equal a listed impairment); *Bradley v. Bowen,* 800 F.2d 760 (8th Cir.1986) (reversal granted where ALJ failed to follow procedural guidelines and to give due consideration to medical and psychological impairments, separately and in combination).

stamp of the Secretary's decision and is more than a mere search for the existence of some evidence supporting the Secretary's decision. *Sharrah v. Secretary of Health and Human Services,* 747 F.2d 457, 459 (8th Cir.1984); *McMillian v. Schweiker,* 697 F.2d 215, 220 (8th Cir.1983).

Claimant has the burden of showing that she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d). Claimant must establish that a disability precludes her from performing her former work. If so established, the burden shifts to the Secretary to prove that there is some other type of substantial gainful activity that the claimant can perform. *Lewis v. Heckler,* 808 F.2d 1293 (8th Cir.1987); *Martin v. Harris,* 666 F.2d 1153, 1155 (8th Cir.1981); *Clark v. Heckler, supra,* 733 F.2d at 68.

### A.

### Hearing Testimony

The only persons to testify at the administrative hearing were the claimant and her daughter. Claimant testified that she was born on February 12, 1938, and that she had completed the ninth grade. (Tr. 39, 42). She testified that her most recent employment was for a lumber company where she worked with various heavy machinery which cut, graded or laminated wood. She worked for that lumber company from 1968 until July 6, 1982. (Tr. 42–43).

Claimant testified that she could not continue her previous employment because of her frequent blackout spells. On July 6, 1982, claimant had been at her previous job "catching lumber" off of a conveyor belt when she blacked out. She was out for more than an hour and a half. (Tr. 57). She was taken to the hospital for that blackout spell. (Tr. 49, 57).

Claimant testified that she suffers from severe headaches which occur just before the blackout spells. (Tr. 50, 51). She also stated she suffers from headaches which may not result in blackout spells but which may last as long as a week. (Tr. 54). These headaches incapacitate claimant. (Tr. 54, 55). She further testified that she suffers from weakness in her left hand: "well, this hand fades, dead like ... [and] I don't have no grip in it." (Tr. 46, 51). Claimant also testified that she suffers from a heart condition (Tr. 50, 51), and shortness of breath. (Tr. 51, 52). She stated that her shortness of breath requires her to sit down and rest after walking a block and a half or when doing household activities (Tr. 52, 53), and that "a lot of nights I wake up struggling for my breath." (Tr. 52). She has to sleep in a sitting up position to alleviate that problem. (*Id.*)

Claimant further testified that she had a tumor removed after she started working for the lumber company, and that she has developed a bowel and stomach problem related to that tumor. (Tr. 52–53, 54). She testified that she suffers from high blood pressure. (Tr. 56). She also testified that she has problems with her back so that sometimes she "can't get up I have to have somebody help me get up or else I get down on my knees and catch hold of something and pull myself up and when I get down I can't hardly walk." (Tr. 56).

Claimant further testified that she is often tired and sleeps much of the day: "[s]ometime I get up, eat and go right back to sleep. Can't get enough sleep.... When I take that medicine it don't even bother me. I just get tired like and then I don't want to do nothing but sleep." (Tr. 58).

Claimant testified that she does what housework she can, but she can only "work awhile and [then] quit." (Tr. 46). Her son does most of the cooking and her sister helps with the household chores. (Tr. 40, 46). Claimant drives occasionally, but is afraid to do so because of her blackout spells. (Tr. 44).

Claimant's daughter testified that claimant has been hospitalized for two or three week periods following blackout spells, and that claimant cannot work or sweep the

yard for any substantial period of time. She stated that claimant is not able to do the cooking and there are frequent times "where [claimant] just has to lay down for a while." (Tr. 61).

No vocational or other expert was called to testify.

## B.

### Documentary Evidence

Dr. Rick Lewis completed a discharge summary upon claimant's release from a three-day hospital stay in August, 1982. Claimant was admitted to the hospital after being found passed out in the street. He summarized her symptoms as "a 2 year history of 'Falling out spells.' These appear to average approximately one to two a month and occasionally occur in clusters.... [Claimant] describes it as a total body weakness that comes on quite suddenly." Dr. Lewis found she had an enlarged heart and a hiatus hernia. His final diagnosis was syncope episode. Because of claimant's complaints of orthopnea and exertional dyspenia, as well as the S4 gallop heard on examination, Dr. Lewis prescribed daily dosages of Lanoxin and a diuretic. (Tr. 104–105).

Claimant's treating physician, Dr. George F. Wynne, concluded that "due to heart trouble, shortness of breath and blackout spells, [the claimant] is totally and permanently disabled to work." (Tr. 122). Dr. Wynne diagnosed claimant as suffering from syncope, etiology unknown, (Tr. 121), headaches, anxiety neurosis, hypertension and nervous palpitations of the heart. (Tr. 120).

The Secretary referred the claimant to an internal medicine specialist, Dr. Allen Pirnique, for an examination on June 7, 1983. He estimated from discussions with claimant that the blacking out spells occur at one- to two-week intervals and that they "can occur in any position and at any time of day." (Tr. 124). His impression was that she was suffering from syncopal episodes of unknown etiology, dyspnea of unknown etiology, and cardiac enlargement

of unknown etiology. (Tr. 125). In conclusion, Dr. Pirnique stated:

> I cannot explain this lady's constellation of problems. I believe that she should have a neurologist's evaluation for her syncopal episoes [sic] to include probably a 5-hour glucose tolerance test and random blood sugars to make sure this is not hypoglycemia ... I feel that this lady's symptoms can all be explained on the basis of her very significant depression problem—that is, her fatigue, her muscle weakness, her shortness of breath, her constant sleeping, and her syncopal episodes.

(Tr. 125).

Claimant was then referred to Dr. Terrell Bishop for a neurological examination which took place on July 16, 1983. He concluded that claimant's "symptomatology and history are very complex and very difficult to sort out." (Tr. 135). His final diagnosis was that she suffered from vasovagal syncope with depression worsening or causing her syncope. He suggested that:

> Under optimal conditions one would normally hospitalize this patient for a full evaluation including full laboratory serum tests, focusing especially on serum glucose fluctuations, areteria blood gases, holter monitor, EEG, and chest X-ray. The differential diagnosis for these types of symptoms include vasovagal syncope, depression with syncope, migraine headaches with loss of consciousness, seizures, transient ischemic attacks, stokes-adams attack, hyperventilation with loss of consciousness, hypoglycemia, narcolepsy, ethanol abuse, and functional sympotomatology.
>
> From this evaluation and from reviewing her extensive history it seems extremely likely that her symptoms are related to vasovagal syncope and or hemodynamic BP changes which in great part may very well be related to either depression and or hyperventilatory attacks.

(Tr. 135).

By letter dated September 13, 1983, Dr. Pirnique confirmed Dr. Bishop's conclusions: "I feel that the 'spells' that Mrs.

Sumler is having are in all probability related to her depressive problem. The spells are most likely some type of vagal syncope as suggested by Dr. Bishop." (Tr. 140).

### III.

■ The ALJ's conclusion that the claimant "retains the residual functional capacity to engage in at least medium work activity" (Tr. 16) is not supported by any substantial evidence. Claimant has concededly met her burden of showing that she "is unable to perform her past relevant work." (Tr. 16). Upon such a showing, the ALJ should have shifted the burden of proof to the Secretary. The Secretary would have been required to show that the claimant has the residual functional capacity to perform other kinds of work, and that jobs are available in the national economy which realistically fit the claimant's capabilities. *O'Leary v. Schweiker,* 710 F.2d 1334, 1338 (8th Cir.1983); *Bogard v. Heckler,* 763 F.2d 361 (8th Cir.1985); *Holland v. Heckler,* 768 F.2d 277, 280 (8th Cir.1985).

The Eighth Circuit clearly requires that the ALJ:

> expressly recognize in his or her written decision that the burden of proof has shifted to the Secretary. *See, e.g., Dover v. Bowen,* 784 F.2d 335, 337 (8th Cir. 1986). In cases where the ALJ fails to expressly recognize this shift, we will assume that the burden of proof improperly remained on the claimant to prove he or she was not disabled and we will remand the matter for further proceedings unless the case is one in which the outcome should be clear regardless of who shoulders the burden of proof. *E.g., Lanning v. Heckler,* 777 F.2d 1316, 1317 (8th Cir.1985).

*Lewis v. Heckler, supra,* 808 F.2d 1293. *See also Bradshaw v. Heckler,* 810 F.2d 786, 789 (8th Cir.1987). The ALJ made no such specific finding in this case.[4]

The ALJ concluded, without any support in the record, that claimant "retains the residual functional capacity to engage in at least medium work activity." Upon consideration of her blackout spells and depression, the ALJ proceeded to erroneously conclude that claimant's impairments reduced "her residual functional capacity but not to the point that she would be prevented from sedentary work activity if seizure precautions are taken." (Tr. 16).

Nothing in the transcript or in any of the doctors' reports indicated that "adequate therapy" or "seizure precautions" would eliminate or lessen claimant's impairments. *Cf. Santifer v. Secretary, supra,* slip op. at 3 (even where therapy would aid claimant, there must be a showing of record that treatment is in fact available to the claimant).[5] Claimant testified that she is on several medications, (Tr. 47–48, 123), prescribed by Dr. Wynne, but nothing in the record indicates that those medications control her conditions. The burden of showing there is a residual functional capacity to perform other work rested on the Secretary under the circumstances of this case. The ALJ erroneously placed that burden on the claimant. Such an improper allocation of the burden of proof constitutes reversible error. *Lewis v. Heckler, supra.*

Besides misallocating the burden of proof, the ALJ jumbled the vocational requirements, finding that claimant was capable of "medium work"[6] without considering all her impairments. After considering some—but not all—of claimant's impairments, the ALJ found that she could

---

4. In fact, it is clear from his statements that the ALJ misplaced the Secretary's burden on the claimant:

> It must be noted that the appraisal of these [blackout] spells is difficult and no specific tests to determine the cause of these spells has been performed.... Additionally there is no showing of any definitive treatment and certainly no showing that such spells that she may suffer would not respond to adequate therapy. (Tr. 15).

5. The standard for a finding of "not disabled" where treatment is possible and available is not mere "amenability" to treatment. The condition must be controlled by the treatment to prevent a finding of disability. *See Heisner v. Secretary,* 407 F.Supp. 444, 447 (E.D.Mo.1975).

6. Medium work is defined in 20 C.F.R. § 404.-1567(c) as work which "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."

perform sedentary work.[7] He then erroneously concluded, without the aid of a vocational expert's testimony or any other reference, "that there are many entry level jobs of a sedentary nature that a young person such as the claimant with a tenth grade education[8] could do that would not be dangerous to her or others." (Tr. 16). *See Bradshaw v. Heckler, supra,* at 790 (error to apply medical-vocational guidelines for non-exertional limitations without vocational expert testimony or other evidence).

■ The ALJ's failure to consider the combined effects of all of claimant's impairments is reversible error. *Bradley v. Bowen, supra.* The ALJ is required by federal regulation and the law of this Circuit to evaluate a claimant's impairments in combination so as not to diminish the total impact of the disability. 42 U.S.C. § 423(d); 20 C.F.R. § 404.1523; *Landess v. Weinberger,* 490 F.2d 1187, 1190 (8th Cir. 1974); *Behnen v. Califano,* 588 F.2d 252 (8th Cir.1978); *Daniels v. Mathews,* 567 F.2d 845 (8th Cir.1977); *Wroblewski v. Califano,* 609 F.2d 908 (8th Cir.1979); *McMillian v. Schweiker, supra,* 697 F.2d 215; *Baugus v. Secretary of Health & Human Services,* 717 F.2d 443 (8th Cir.1983).

Claimant testified that she suffered from migraine headaches (Tr. 54); blackout spells (Tr. 50); shortness of breath (Tr. 51, 53); a heart condition (Tr. 51); high blood pressure (Tr. 55); weakness in her left hand and arm (Tr. 51); back problems (Tr. 56); stomach and bowel spasms (Tr. 52–53); and excessive tiredness (Tr. 58). The ALJ is under legal duty to consider subjective testimony even where it is not supported by objective medical evidence. *Reinhart v. Secretary,* 733 F.2d 571, 573 (8th Cir.1984); *Basinger v. Heckler,* 725 F.2d 1166, 1169 (8th Cir.1984). The ALJ failed to make specific findings regarding any of these conditions except the blackout spells.

■ As a further point of error, the ALJ failed to give appropriate weight to the treating physician's reports. Dr. Wynne concluded that the claimant was disabled, and filed supporting reports in favor of that conclusion. The controlling Eighth Circuit rules of decision make it clear that the treating physician's reports must be given appropriate weight in a disability determination. The reports of non-examining physicians or reports of consulting physicians who examine the claimant on only one occasion may not properly be considered as controlling. *Smith v. Heckler, supra,* 735 F.2d at 316; *McCoy v. Schweiker,* 683 F.2d 1138, 1147 n. 8 (8th Cir.1982). Therefore, Dr. Wynne's reported observations were entitled to full consideration by the ALJ.

We find and conclude that the Secretary's decision should be reversed outright. Remand under the circumstances established by the record in this case would serve no purpose. The record was fully developed and the evidence fully supports a finding of disability. The Eighth Circuit has made clear that "[w]here a rehearing would simply delay receipt of benefits, reversal is appropriate." *Tennent v. Schweiker,* 682 F.2d 707, 710 (8th Cir.1982); *Smith v. Heckler, supra,* 735 F.2d at 317; *Cook v. Bowen, supra,* 797 F.2d 687.

**IV.**

It is appropriate that we enter an order which will coordinate the entry of our order reversing the Secretary's decision with the entry of an order that will determine whether any award of attorney's fees may properly be made under the circumstances of this case. For the Eighth Circuit has directed that "the problem of fragmented appeals in cases calling for an award of attorney's fees may be obviated if trial judges enter but one judgment after determining all issues in a case, including the merits of the action and any claim for attorney's fees." *Obin v. District No. 9 of*

---

7. "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.... *walking and standing are required occasionally.*" 20 C.F.R. § 404.1567(a).

8. Claimant testified that she had completed the ninth, not the tenth, grade. (Tr. 42).

*the International Association of Machinists and Aerospace Workers,* 651 F.2d 574, 584 (8th Cir.1981).

It is also appropriate that we discuss the May 1, 1984 motion to remand filed in this Court by Mr. Thornton shortly after he assumed the responsibility of representing the claimant. For the filing of that motion reflects the only action taken by him during the course of his representation of the claimant in this Court.

### A.

As noted in part I above, Mr. Thornton filed the motion to remand on May 1, 1984. The Secretary did not file any suggestions in opposition to that motion.[9] It is appropriate for this Court to enter a ruling on the pending motion to remand in order to eliminate any procedural problems that might otherwise arise in the event of a possible appeal.

Both Mr. Thornton's motion to remand and the suggestions filed in support of that motion are generalized points made in what appears to be a standardized format. The motion itself, for example, argued that "[t]his matter should be remanded for the following reasons: (a) Absence of counsel." It is clear from the record in this case that claimant had competent counsel representing her at the hearing stage of this proceeding.

The suggestions in support are merely generalized statements of law regarding when remand may be applicable. The only argument presented which refers directly to whether and why remand may be applicable in this case was in the final two sentences of the supporting brief which stated: "The new evidence needed herein is psychological and vocational. The report of Dr. Douglas A. Stevens, clinical psychologist and vocational expert, dated April 9, 1984 is attached hereto as Exhibit 'A'".

We have considered Dr. Stevens' report[10] and the motion to remand. We find and conclude that it should have been obvious that Dr. Stevens' report could not properly be considered as new evidence within the applicable standard that would have required remand. Dr. Stevens' report did, of course, lend additional support for Dr. Pirnique's and Dr. Bishop's conclusion that the claimant suffers from severe depression. The basis for such a finding, however, was already in the record. Dr. Stevens' report would have merely added to the record already made before the ALJ and was but cumulative evidence. Had the ALJ properly considered claimant's combination of impairments as already established by the evidence before him, it is clear that claimant's depression would have been considered as a factor leading unavoidably to a finding of disability under all the circumstances of this case.

Accordingly, a formal order will be entered denying claimant's May 1, 1984 motion to remand.

### B.

Cross-motions for summary judgment are the usual procedure used for district court review and disposition of disability cases in this Circuit. *See,* for a recent example, *Santifer v. Secretary, supra,* slip op. at 1 (appeal from district court grant of motion for summary judgment). *See also Flores v. Heckler,* 755 F.2d 401, 403 (5th Cir.1985) (Although "Rule 56 does not fully fit the district court's role in the review of the Secretary's decision, ... the procedures of Rule 56 are used nigh universally in [the Fifth] circuit because its familiar procedural commands get the job done.").

---

**9.** Part VI of the Secretary's brief in support of his motion for summary judgment did discuss the alternative prayer for remand made in the claimant's complaint. The general discussion of remand made in that part of the Secretary's brief, however, was not specifically directed to the May 1, 1984 motion to remand.

**10.** It is apparent that Mr. Thornton could have submitted Dr. Stevens' report to the Appeals Council, thus possibly avoiding the present action. Dr. Stevens' report shows that he first examined the claimant on March 1, 1984. The Appeals Council did not render its decision final until March 28, 1984. Therefore Dr. Stevens' conclusions could have been submitted to the Appeals Council for its consideration before this action was filed. *See* 20 C.F.R. § 404.970(b), § 404.976(b) and § 404.975.

■ Section 405(g), however, provides that a district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." Summary judgment procedure is, therefore, not required under the Social Security Act; it merely serves as a convenient method under which both parties may present appropriate briefs in support and in opposition to the respective positions of the parties.[11]

## C.

■ A district court may, in its discretion, award attorney's fees to a prevailing claimant in a Social Security disability action. *See* 28 U.S.C. § 2412(b); 42 U.S.C. § 406(b)(1).

It is difficult to conceive how an award of fees could be justified on the circumstances of this case. Title 28 U.S.C. § 2412(d)(1)(C) provides that the "court, in its discretion, may ... deny an award, to the extent that the prevailing party during the course of the proceedings engaged in conduct which unduly and unreasonably protracted the final resolution of the matter in controversy". The record in this case establishes that Mr. Thornton did no more than file a boilerplate complaint and a boilerplate motion to remand and brief in support on behalf of his client. He failed

to file any motion or brief in support of his client's position. He failed to file any brief in opposition to the Secretary's motion for summary judgment.[12]

Substantial questions are obviously presented as to whether Mr. Thornton properly discharged the duties he became obligated to perform for the claimant and to the court when he filed a complaint in behalf of the claimant in this Court. Those familiar duties are generally set forth as Rule 2 of the Arkansas Rules of the Court Regulating Professional Conduct of Attorneys at Law (1986 Supp.): "A lawyer is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice.... In all professional functions a lawyer should be competent, prompt and diligent." *See also* Rule 1.1 (competent representation); Rule 1.3 (diligence and promptness); Rule 3.2 (expediting litigation); Rule 8.4(d) (conduct that is prejudicial to the administration of justice is professional misconduct). It is thus apparent that substantial questions are presented in regard to whether he has unreasonably protracted this litigation to the detriment of his client in particular and in general to the administration of justice of this Court.

Accordingly, an order will be entered that will require Mr. Thornton to show cause why an order should not be entered

---

**11.** The District of Columbia, Fourth, Fifth, Sixth, and Ninth Circuits have all held that summary judgment is a proper—but not a necessary—procedural method for the submission of disability cases. *Igonia v. Califano*, 568 F.2d 1383, 1389 (D.C.Cir.1977); *Myers v. Califano*, 611 F.2d 980 (4th Cir.1980); *Flores, supra*, 755 F.2d at 403; *Kistner v. Califano*, 579 F.2d 1004 (6th Cir.1978); *McMullen v. Celebrezze*, 335 F.2d 811, 814 (9th Cir.1964), *cert. denied*, 382 U.S. 854, 86 S.Ct. 106, 15 L.Ed.2d 92 (1965). Whether a district court acted properly in reaching the merits in a disability case where the court is faced with limited pleadings and briefs from the parties is determined by whether there was an appropriate opportunity for the parties to present their contentions. *Flores, supra*, 755 F.2d at 403. Here, the Secretary's motion for summary judgment was filed almost 18 months ago. Claimant had more than an adequate opportunity to respond to that motion, but he failed to do so. This case is therefore in an

appropriate posture for a determination on the merits.

**12.** This Court's initial examination of the file forwarded from the Western District of Arkansas suggested that the Clerk of that Court may have inadvertently failed to forward everything that had been filed on claimant's behalf in this case. For Local Rule 20(b) of the Western District of Arkansas expressly provides, as do the Local Rules of most district courts, that "[w]ithin ten days from the date copies of a motion and supporting papers have been served upon him, any party opposing a motion shall serve and file with the Clerk a concise statement in opposition to the motion with supporting authorities."

We therefore made appropriate inquiry and were advised that the complete file had in fact been forwarded for this Court's review and determination of this case.

denying claimant's counsel any award of attorney's fees.

Accordingly, it is

ORDERED (1) that plaintiff's May 1, 1984 motion to remand should be and is hereby denied. It is further

ORDERED (2) that the final decision of the Secretary is hereby reversed and the case is remanded to the Secretary with directions to determine and distribute disability benefits as of July 6, 1982 pursuant to 42 U.S.C. § 423. It is further

ORDERED (3) that on or before February 27, 1987, Denver L. Thornton, claimant's attorney of record in this case, shall prepare, serve, and file a response to this order with the Clerk of the United States District Court for the Western District of Arkansas, El Dorado Division, in which he shall show cause why an order should not be entered that will determine that he is not entitled to any attorney's fees under either 42 U.S.C. § 406(b)(1) or 28 U.S.C. § 2412 under the factual circumstances above-stated. The Clerk shall immediately forward a copy of such response to the undersigned judge in Kansas City, Missouri. It is further

ORDERED (4) that in the event Mr. Thornton does not elect to file a timely response to this Court's order to show cause as stated in Order (3), it will be assumed that he does not intend to file any application for an award of attorney's fees in this case. It is further

ORDERED (5) that the Clerk shall not enter any judgment on a separate document pursuant to Rule 58 of the Federal Rules of Civil Procedure in favor of the plaintiff and against the defendant until further order of court. A further order directing the Clerk to enter such a judgment will be entered promptly after this Court determines whether any attorney's fee should be awarded under the circumstances of this case.

1. We do not presume, as a judge only designated to sit in particular cases that pend in the Western District of Arkansas, to establish guidelines for that district court. We publish our February 19, 1987 memorandum opinion and this supplemental memorandum opinion for the

## SUPPLEMENTAL MEMORANDUM OPINION AND ORDER DENYING AN AWARD OF ATTORNEY'S FEES

Mr. Thornton filed a fourteen page response, together with a number of exhibits, in compliance to this Court's Order (3) entered February 19, 1987. That response commenced with a sentence that stated in somewhat guarded language that "I request no fee *if you feel that no benefit has been conveyed to my client.*" (Emphasis added). Response at 1. The last sentence of the response stated that "[t]he fee is really irrelevant." *Id.* at 14. Conceivably, the position reflected by those two isolated sentences could be said to support an order denying any attorney's fee award in this case. His lengthy response, however, implicitly suggests that an order denying an attorney's fee award should not be entered under the circumstances of this case.

In light of the importance of the questions presented in regard to the attorney's fee provisions of the Social Security Act, 42 U.S.C. § 406(b), (hereinafter Section 406(b)) and the Equal Access to Justice Act, 28 U.S.C. § 2412 (hereinafter EAJA), it is appropriate that we review the full position stated in the lengthy response to Order (3) and state the reasons why we must find and conclude that the response fails to show cause why an order should not be entered that will deny any award of attorney's fees under either of those statutes.[1]

### I.

On page 1330 of our February 19, 1987 memorandum opinion we stated that:

The record in this case establishes that Mr. Thornton did no more than file a boilerplate complaint and a boilerplate motion to remand and brief in support on behalf of his client. He failed to file any motion or brief in support of his client's position. He failed to file any brief in

guidance of the Bar of the Western District of Missouri and for whatever assistance our discussion of these troublesome problems may give to other courts that are required to face the same problems.

opposition to the Secretary's motion for summary judgment.

In footnote 12 we directed attention to Local Rule 20(b) of the Western District of Arkansas which provides that counsel opposing a motion filed by an adverse party "shall serve and file ... a concise statement in opposition to the motion with supporting authorities."

We concluded that, under those circumstances, "[s]ubstantial questions are obviously presented as to whether Mr. Thornton properly discharged the duties he became obligated to perform for the claimant and to the court when he filed a complaint in behalf of the claimant in this Court." Memo. op. at 1330. Order (3) entered in this case on February 19, 1987 required claimant's attorney to file a response in which "he shall show cause why an order should not be entered that will determine that he is not entitled to any attorney's fees under either 42 U.S.C. § 406(b)(1) or 28 U.S.C. § 2412 under the factual circumstances above-stated."

The response filed to Order (3) does not mention either Section 406(b) or the EAJA. Nor does it discuss the standards that a district court must apply in regard to either of those fee statutes. Rather, Mr. Thornton's response stated as a matter of "background," that "[t]wenty years ago I was a law clerk and bailiff to The Honorable Oren Harris, United States District Judge here in El Dorado, Arkansas" and that "[a]s a junior law clerk I did a lot of research, particularly in the Social Security area." Response at 1. He further stated

that "I think I can safely say that from 1980 to approximately 1985 there has been a flood of Social Security cases in the Federal Courts [and that] [t]hese cases have placed an impossible burden on the United States District Courts and, to a substantial extent, on the Eighth Circuit Court of Appeals," and that "I have seen Social Security cases overflowing [Judge Harris'] files and being placed in boxes." *Id.* at 2.

Mr. Thornton's response further stated, and we have no reason to doubt his statement, that "I probably handle more Social Security litigation than anybody in South Arkansas or North Louisiana" and that "I handled this case like I have handled hundreds of others." *Id.* at 3. The response states that those cases were processed in the following manner:

> The government usually files a Motion for Summary Judgment. I may counter with a Motion to Remand, or may not. Other times I may merely file a brief, or I may not.[2]

*Id.* at 2–3.

The response frankly states that "[i]n the many cases in the last twenty years that I have processed through the Federal Court I have followed this procedure...."[3] *Id.* at 3.

Mr. Thornton stated, however, that he cannot understand why any substantial questions are presented in regard to whether this case has been unreasonably protracted by Mr. Thornton's failure to file anything more than a boilerplate complaint and a boilerplate motion to remand.[4] In

---

2. Mr. Thornton attached a copy of a letter dated February 16, 1987 which he had written to The Honorable Henry L. Jones, Jr., United States Magistrate at Little Rock, in response to a draft of an order that Magistrate Jones proposed for entry in all Social Security cases assigned to him. That letter stated in part that:

> Basically, what you are asking us to do is prepare you a brief to assist you in your decision. *We ought to do this as a matter of course but we don't do it because of the expense and time involved. Usually, we wait until we get to the 8th Circuit.* I don't mind doing that. (Emphasis added).

3. Examination of the files of the four Social Security cases transmitted by the Clerk of the Western District of Arkansas in which I have

been designated to sit in that district, established that in the other three Social Security cases, Mr. Thornton did no more than file a boilerplate complaint.

4. The response conceded that the complaint was a "boilerplate" complaint. The reasons why the motion to remand was so described are stated in part IV, page 1329 of our February 19, 1987 memorandum opinion. The only Eighth Circuit case cited in support of the motion, *Bohms v. Gardner,* 381 F.2d 283 (8th Cir.1967), *cert. denied,* 390 U.S. 964, 88 S.Ct. 1069, 19 L.Ed.2d 1164 (1968), decided twenty years ago, simply held that a district court's order remanding a Social Security case to the Secretary was not a "final decision," within the meaning of 28 U.S.C. § 1291.

regard to the motion to remand filed shortly after the boilerplate complaint was filed and long before a copy of the hearing transcript was filed, Mr. Thornton stated "I know of nothing else that I can do until some Judge picks this matter up and rules on my motion." *Id.* at 4. He reiterated that "I don't know anything else that this attorney could have done to facilitate the matter" and that "[i]t has been my experience that in due course the case will be considered, and it was." *Id.* at 9–10. On pages 10 and 11 Mr. Thornton stated his view that "[a]fter the Answer is filed in a Social Security case I think the Court can rule at any time that the award of the ALJ either is or is not supported by substantial evidence" and argues that "I cannot be at fault because the Court has not, due to an awesome workload had an opportunity to review this file."

Mr. Thornton contends on page 11 of his response that the filing of a motion to remand immediately after a boilerplate complaint is filed and before the hearing transcript has been filed with the district court is an effective procedural device to move the case to decision.[5] He stated that "it is usually a quick relief motion, especially with the crowded docket" and that "[i]t has worked for me in the past." *Id.* at 11. Although the plaintiff in this case, without the benefit of any effective assistance of counsel in regard to the merits of his case, obtained an outright reversal of the Secretary's decision, the response argues that the filing of a boilerplate motion to remand shortly after a boilerplate complaint is filed should be considered to be

the preferred procedure to follow in a Social Security case for the reason that:

> I think it is easier to get a district judge to grant remand than reversal. *Certainly, this edge is in the best interest of the claimant because it gives him a second bite at the apple....* Even if Judge Harris would have denied, I would have had an additional point for reversal at the 8th Circuit.[6] (Emphasis added).

*Id.*

Mr. Thornton attempted to support his procedural preference in favor of motions to remand by stating that under such a procedure "I do not have to file lengthy briefs" and because "[i]t saves the Social Security claimant money." *Id.* Mr. Thornton's response reiterated that "I still feel that remand cases with merit moves cases much more faster than arguing for reversal on summary judgments, *is in the claimant's best interest,* [and] adds additional potential error when ignored...." *Id.* at 13. (Emphasis added).

No effort, however, is made to support the notion that a remand to the Secretary somehow results in saving a Social Security claimant money. Nor is any effort made to explain Mr. Thornton's apparent preference for winning a Social Security case in the Court of Appeals rather than in the district court. It is, of course, obvious that the claimant's money is not saved during the pendency of an appeal to the Court of Appeals and that a successful Social Security claimant's ultimate recovery is substantially reduced by the length of time his

---

5. In our recital of the procedural history of this case, on page 1324 of our February 19, 1987 opinion we noted that Mr. Callaway represented the claimant at the April 19, 1983 hearing before the ALJ and that Mr. Thornton's representation did not commence until late December, 1983, long after the ALJ rendered his decision on October 19, 1983. It is thus clear that Mr. Thornton filed the motion to remand in the district court before the transcript of the administrative hearing had even been prepared.

6. The response added that "[i]n the last two years, I believe I have been to the 8th Circuit five times in Social Security cases and I have won all five." *Id.* at 11. It would seem obvious that if Mr. Thornton had filed an appropriate

brief in opposition to the Secretary's usual motion for summary judgment and boilerplate brief in support, then there may not have been any necessity for the claimant to have noticed an appeal to the Court of Appeals.

For Mr. Thornton accurately paid appropriate tribute to one of the Eighth Circuit's most distinguished district court judges by stating that The Honorable Oren Harris "has the finest factual mind in the business and has handed down literally hundreds of Social Security cases in the last twenty years." *Id.* It is unlikely that the district court would have been reversed in those five cases had it been afforded the benefit of the briefs that were later filed in the Court of Appeals.

case is in litigation before the Secretary's decision is ultimately reversed.[7]

We turn now to the cases which articulate the standards that control a district court's discretion in awarding attorney's fees in Social Security cases under Section 406(b).

## II.

### A.

The principles that govern the exercise of a district court's discretion in regard to attorney's fee awards sought under Section 406(b) are articulated in the leading case of *McKittrick v. Gardner*, 378 F.2d 872 (4th Cir.1967), which amplified the Fourth Circuit's earlier *en banc* decision in *Redden v. Celebrezze*, 370 F.2d 373 (4th Cir.1966), and in the numerous progeny of *McKittrick* including, but not limited to, *Webb v. Richardson*, 472 F.2d 529 (6th Cir.1972).[8]

In *Redden*, the Fourth Circuit *en banc* denied petitions for rehearing the earlier panel decisions in *Lambert v. Celebrezze*, 361 F.2d 677 (4th Cir.1966), and *Redden v. Celebrezze*, 370 F.2d 373 (4th Cir.1966), both of which had considered the impact of

the 1965 amendment to the Social Security Act which enacted Section 406(b). In denying rehearing, *Redden* appropriately noted that "provision for judicial determination of the fee and the insertion of a statutory maximum was prompted by reports that exorbitant fees had been charged and collected by lawyers representing claimants of Social Security benefits in the federal courts ..." 370 F.2d at 374.

*Redden* was the first Court of Appeals' decision that commented on the potential conflict of interest created by Section 406(b) between a Social Security claimant and his attorney.[9] *Redden* stated that "the maximum limitation should be adequate to provide a reasonable fee for the lawyer who diligently prosecutes the case and brings it to an early conclusion." *Id.* at 376. It concluded that, under a proper construction of Section 406(b), a lawyer representing a Social Security claimant should not be "encouraged to resort to obvious procedural devices for the enhancement of his own fee" for the reason that "these disability cases are frequently drawn out over a considerable period of time and the accrued benefits which are

---

7. *Bradley v. Bowen*, 800 F.2d 760 (8th Cir.1986), is a recent example of a claim that pended "for nearly six years" in the Western District of Arkansas and in which the claimant received no relief until the case was reversed outright in the Court of Appeals. We do not know whether attorney's fees were subsequently awarded under either Section 406(b) or under the EAJA.

We do know, however, from a copy of an order entered in the Western District of Arkansas on May 12, 1986 in *Norrell v. Secretary of Health and Human Services*, No. 82–1086, which Mr. Thornton attached as an exhibit to his response, that the Secretary was directed to pay an attorney's fee award of $1,008.00 pursuant to Section 406(b) out of the claimant's pastdue benefits that had been accruing in that case since April, 1979. That order does not show how Mr. Thornton spent the seven hours of district court time on which his fee application was based.

8. The Eighth Circuit has cited *McKittrick* with approval and followed the rationale of that case in *Fenix v. Finch*, 436 F.2d 831 (8th Cir.1971), and in *Brissette v. Heckler*, 784 F.2d 864 (8th Cir.1986). *Fenix* and *Brissette* were most recently followed in the Eighth Circuit in *Rohrich v. Bowen*, 796 F.2d 1030 (8th Cir.1986). The Eighth Circuit has also cited with approval the

recent Sixth Circuit case of *Lewis v. Secretary of Health & Human Services*, 707 F.2d 246 (6th Cir.1983), which was based on the Sixth Circuit's earlier decision in *Webb*, together with the Fifth Circuit decision in *Dawson v. Finch*, 425 F.2d 1192 (5th Cir.), *cert. denied,* 400 U.S. 830, 91 S.Ct. 60, 27 L.Ed.2d 60 (1970), another of *McKittrick's* progeny. *See also MacDonald v. Weinberger*, 512 F.2d 144 (9th Cir.1975), which also followed *McKittrick*.

9. Judge Michie of the Western District of Virginia was, so far as we know, the first district court judge to recognize that potential conflict of interest. In *Blankenship v. Gardner*, 256 F.Supp. 405, 410 (W.D.Va.1966), decided shortly before *Redden* was decided, Judge Michie stated that "it is only with the greatest reluctance that I enforce what I believe to be a very unwise law" for the reason that "this new law gives every lawyer who takes a social security case an interest adverse to his client. It is obvious that it will always be to the client's interest to get the case concluded as promptly as possible. But under this new law it will always be of financial benefit to the lawyer to delay the case as much as possible so that the accumulated benefits in which he is to share will be larger."

That portion of Judge Michie's opinion was later quoted in *Webb*.

ultimately determined to be payable may be very substantial." *Id.* at 376.

*Redden* added that in cases in which a substantial delay had in fact occurred:

> [J]udges should constantly remind themselves that while the lawyer is entitled to a reasonable compensation for the services rendered by him in the judicial proceeding, these benefits are provided for the support and maintenance of the claimant and his dependents and not for the enrichment of members of the bar.[10]

*Id.*

*McKittrick* reversed attorney fee awards made pursuant to Section 406(b) by two Fourth Circuit district courts shortly before *Redden* was handed down.[11] *McKittrick* concluded that "[o]ur holding on rehearing in *Redden* requires a vacation of the fee orders in these cases" for the reason "the statute requires the court to fix and allow a reasonable fee for services rendered" and because the Congressional scheme did not contemplate "blind deference to contractual fee arrangements." 378 F.2d at 873.

Chief Judge Haynsworth, the author of both *Redden* and *McKittrick*, amplified the reasons for the potential conflict of interest which had first been noted in *Redden*. He stated that if it were to be determined that "a contingent fee contract governs the amount of the fee, the dilatory lawyer is given a premium; the prompt, effective lawyer who moves expeditiously is penal-

ized." He added that "it is obvious that ... the size of the fee base would depend, to a substantial extent, upon the effectiveness of the lawyer's advancement of his client's cause with an inverse effect upon his fee." *Id.* at 874. He concluded that the "regrettable delays in the final adjudication of these claims ... should not be compounded by incentives for procrastination and delaying tactics on the part of a claimant's attorney." *Id.*

*McKittrick* further stated that "[m]ore importantly, the worth of the lawyer's services varies profoundly with his effort and its effectiveness" and explained that:

> There are lawyers in this circuit, handling such claims, who file complaints in such general and summary form that a secretary could prepare them from office forms. The complaint is followed by a motion for summary judgment in a form appropriate for every case. Without the assistance of any brief or any exposition of the facts, the lawyer casts upon the court the burden of sifting the record and, unaided, of resolving any legal question which may be involved.

*Id.*

*McKittrick* concluded that "[s]uch lawyers, expending little or no effort as advocates of their clients' causes ... do not deserve the same fee allowance as their more deserving brothers who conscientiously assist their clients ·and the courts." [12] *Id.*

---

**10.** *Redden* emphasized that "[r]outine approval of the statutory maximum allowable fee should be avoided in all cases. In a great majority of the cases, perhaps, a reasonable fee will be much less than the statutory maximum. The statute directs a determination and allowance of a reasonable fee and the courts are responsible under the Act for seeing that unreasonably large fees in these Social Security cases are not charged or collected by lawyers." *Id.* at 376.

**11.** One district court "declared that fees would be routinely allowed in accordance with contingent fee contracts if the contractual fee did not exceed twenty-five per cent of the accrued benefits." 378 F.2d at 873. The other district court "routinely approved a fee equal to twenty-five per cent of the claimant's accrued benefits." *Id.*

**12.** *McKittrick* rejected the argument that its construction of Section 406(b) imposed the burden on the district court to conduct an evidentiary

hearing in regard to all applications for attorney's fees. *McKittrick* held that the "judge who has decided a case, need hold no evidentiary hearing to determine the extent and quality of the assistance he received from the lawyers in reaching his conclusion and in preparing an opinion" and explained that the "district judge will know what assistance he received from the claimant's attorney. If, with little or no assistance, he is required to read the entire administrative record, discover the issues and do the basic research in his library before he approaches performance of his ultimate decision-making role, he will know it." *Id.* at 874–75.

*McKittrick* added that "evidence of a lawyer's fidelity and commitment to his client's cause ... is reflected in his performance in court"; that "the controlling criterion will remain the quantity and quality of the lawyer's services as observed by the judge in the judicial proceedings"; and that "in the vast majority of cases, the

*Webb v. Richardson, supra,* 472 F.2d 529, like this case, involved a lengthy delay and boilerplate pleadings filed by the claimant's attorney.[13] The Secretary's decision denying benefits was eventually reversed and the claimant was awarded benefits in the amount of $19,273.60. An attorney's fee award of $4,818.37 was sought pursuant to Section 406(b) based, among other things, on "a contingent-fee agreement under which the claimant agreed to pay [claimant's attorney] 25% of all benefits awarded, [and] a statement signed by the claimant that the fee sought was fair and reasonable." 472 F.2d at 531.

The Secretary opposed such an award in the district court on the ground that "approximately 40% of the award had accumulated during the four-year delay between the time of the filing of the last brief and the rendering of judgment...." *Id.* at 531. The district court, however, awarded an attorney's fee in the amount prayed for and the Secretary noticed an appeal. The Sixth Circuit concluded that "the fee fixed by the court was not reasonable in the circumstances of this case, and we remand for reconsideration." *Id.* at 530.

*Webb* reviewed the legislative history of Section 406(b) and concluded that "[t]he desire to protect claimants from abuses of the contingent-fee arrangement prompted Congress in 1965 to amend the Social Security Act to regulate explicitly the award-

ing of attorney fees for in-court representation." [14] *Id.* at 533. *Webb* adopted the rationale of *McKittrick* and *Redden.* As noted in footnote 9 above, *Webb* quoted extensively from Judge Michie's observation in regard to the potential conflict of interest aspect of Section 406(b).

*Webb* expressed doubt whether the boilerplate filings made by claimant's attorney "would have justified a fee of 25% of the past-due benefits if the court had reversed the Secretary in the spring of 1967...." *Id.* at 537. *Webb* concluded that "we have no doubt that the court abused its discretion in 1971 by awarding 25% of past-due benefits of which nearly 40% accrued solely by reason of the court's inexcusable delay in rendering judgment." *Id.* *Webb* further concluded that "courts should not award the statutory maximum when final decision has been deferred out of all proportion to delay reasonably incident to the normal course of litigation." [15] *Id.*

We are satisfied that the Eighth Circuit decisions cited in footnote 8 above clearly indicate that our controlling appellate court approves the principles stated by the Fourth Circuit in *McKittrick* and *Redden* and by the Sixth Circuit in *Webb.* We are satisfied that the principles stated in the cases cited would require that this Court exercise its discretion against making any

judge's own observation of the lawyer's performance in the adjudicatory process will be a sufficient basis for his allowance of a reasonable fee." *Id.* at 875.

13. The delay in *Webb* was occasioned by entirely different circumstances than those that caused the delay in this case. We will return to that question in part II, B, *infra.* The legal issue before the district court in *Webb,* like the legal issue before the court in this case, was "a routine, substantial-evidence question of ordinary complexity." In *Webb,* claimant's counsel filed only "a two-page 'boilerplate' complaint (which incorrectly referred to claimant as 'she' and which incorrectly stated that the Appeals Council had denied review) and a ten-page brief." 472 F.2d at 537.

On page 1329 of our February 19, 1987 memorandum opinion we noted that the boilerplate motion to remand filed in this case incorrectly alleged that the claimant had not been represented by counsel at the ALJ hearing.

14. The *Webb* court quoted extensively from the Report of the Senate Finance Committee to support its conclusion that "[b]y enacting the 1965 amendment, Congress obviously intended at least to insure that, regardless what the attorney charged for work before the Secretary, he could recover in addition thereto a contingent fee of no more than 25% of the past-due benefits approved by the court.... The 1965 amendment also removed any doubt about the power of a court to determine the reasonableness of a fee." *Id.* at 534.

15. In directing the proceedings to be conducted on remand *Webb* concluded that "[i]n determining a reasonable fee, the District Court should be guided by the principles so well set out in *McKittrick v. Gardner, supra,* and should bear in mind that '[r]outine approval of the statutory maximum allowable fee should be avoided in all cases.' *Redden v. Celebrezze, supra,* 370 F.2d at 376." *Id.* at 538.

Section 406(b) attorney's fee award under the circumstances of this case.

### B.

We have noted that the delay in processing this case was caused by circumstances different from those that caused the delay in *Webb.* In *Webb,* the Sixth Circuit faulted claimant's attorney for having failed to make "any effort over the three and one-half years of delay to induce the District Judge to decide the case." *Id.* at 539. Indeed, *Webb* went so far as to state that claimant's counsel had violated a "duty to seek extraordinary writs in this court when necessary...." *Id.* at 539.

We make clear that we do not in any way fault Mr. Thornton for any violation of duty to seek some sort of extraordinary relief in the Court of Appeals to require the district judge to decide this case. Any experienced district judge that has processed Social Security cases over the relevant periods of time is painfully cognizant of the fact that the causes and problems of delay in the 1980's is much more acute and is substantially different from the causes and problems of delay in the 1960's and 1970's.

When *Webb* was decided in 1972, for example, the fault could, in most instances, be attributed to inadequate representation afforded the claimant by his attorney. While that factor is still present in an isolated number of Social Security cases, one would indeed be judicially naive if he or she fails to recognize that most of the fault for delay in the decade of the 1980's must be assessed against the Secretary and the manner in which the Social Security Act has been administered.

*Peveler v. Schweiker,* 557 F.Supp. 1048 (W.D.Ky.1983); *Flannery v. Secretary of Health & Human Services,* 583 F.Supp. 347 (E.D.Ky.1984); and *Lewis v. Heckler,* 605 F.Supp. 9 (E.D.Ky.1984), reflect the experience of district courts with the delays occasioned in the 1980's by the conduct of the Secretary and the administration of the Act.[16] *Wier on Behalf of Wier v. Heckler,* 734 F.2d 955 (3d Cir.1984), is an excellent example of the views of the Courts of Appeals. Judge Edward R. Becker made reference to essentially the same figures to which Judge Heaney made reference in his Hamline Law Review article entitled *Why the High Rate of Reversals in Social Security Disability Cases?,* 7 Hamline L.Rev. 1 (Jan. 1984), and stated that the Third Circuit was troubled by "the fact that the Secretary so often appears to have wrongfully withheld benefits or to have processed a claim so that it is impossible to tell whether he correctly denied benefits." [17] 734 F.2d at 957.

It is not necessary or appropriate for present purposes to further detail the current causes of delay in processing the flood of Social Security cases which presently pend throughout the federal judicial system. Nor need we further detail the obvious and tragic consequences of that delay. It is sufficient to say that the causes of delay in the 1970's were entirely different than those that have created the delays in the 1980's and that remedies that were appropriate in the 1970's are not appropriate today. It is for that reason that we do not fault Mr. Thornton for any failure to seek some sort of extraordinary remedy in the Court of Appeals to obtain an earlier district court decision in this case.

We turn now to the attorney's fee award under the EAJA in Social Security cases.

---

**16.** In *Flannery,* for example, Judge Wilhoit noted that "[t]his Court, and probably most others, has been plagued by the government's constant delay in dealing with Social Security cases." 583 F.Supp. at 348. In recognition of the hardship worked on Social Security claimants, Judge Wilhoit adopted the interim payment solution formulated by former Chief Judge Miles W. Lord in *LaBonne v. Heckler,* 574 F.Supp. 1016 (D.Minn.1983), *appeal dismissed,* 732 F.2d 161 (8th Cir.1984).

**17.** Judge Sarokin of the District of New Jersey supplemented the data stated in *Wier on Behalf of Wier* in *Merli v. Heckler,* 600 F.Supp. 249, 250 (D.N.J.1984), to support his view that "[t]he Department of Health and Human Services has apparently determined to effect economies by systematically denying disability benefits to those persons who are entitled to them. The evidence (of which the court takes judicial notice) in support of this conclusion is so overwhelming that it cannot be refuted."

## III.

### A.

The unconscionable delays occasioned by the recent Secretaries' calloused administration of the Social Security Act and the atypical rate of judicial reversals of the Secretaries' decisions focused judicial attention on the injustices occasioned by the reduction of the benefits eventually awarded a claimant as a result of a Section 406(b) attorney's fee award. Both the district courts and the courts of appeal have accordingly come to recognize that awards of attorney's fees pursuant to the EAJA in all appropriate cases are to be preferred over attorney's fee awards made pursuant to Section 406(b). We discuss only three recent district court decisions that reflect the view of numerous district courts throughout the federal system.

### B.

In 1984, for example, Judge Telesca, in *Allen v. Heckler,* 588 F.Supp. 1247 (W.D.N. Y.1984), published his memorandum decision in that case "as a guide to both Social Security recipients and attorneys alike concerning the method of calculation and responsibility for the payment of attorney's fees in Social Security cases." 588 F.Supp. at 1249. He explained that "the actions of the Social Security Administration over the past few years have visited extreme hardship upon a group of people to whom life had already dealt a low blow," *id.* at 1251, and concluded that "if the Social Security claimant's counsel can establish the statutory prerequisites, the EAJA supplies an attractive alternative for payment of counsel fees in that payment is made directly by the Government and not from the claimant's past due benefits." *Id.* at 1249. The Bar was accordingly directed to follow guidelines which recognized that the Court "would prefer where applicable that attorneys seek fees pursuant to the E.A.J.A., 28 U.S.C. § 2412, while this method continues to be available." *Id.* at 1251.

In 1985, the District of New Jersey in *Taylor v. Heckler,* 608 F.Supp. 1255 (D.N. J.1985), after directing attention to its 1984 decision in *Merli v. Heckler, supra,* stated that it had previously suggested that "the Equal Access to Justice Act be utilized as a means of deterring the indifference displayed by the Department of Health and Human Services to court precedent as well as to the suffering and humiliation of those to whom benefits have been wrongfully denied." *Id.* at 1256. That case made reference to the current abnormally high reversal rate of the Secretary's decisions and concluded that the principles stated in *McKittrick, Redden,* and *Lewis* should be applied to regulate the sequence in which applications for attorney's fees in Social Security cases should be filed.

Attorneys were accordingly placed "on notice that from this point forward, they act at their peril, rather than at the peril of their clients, when they move for fees pursuant to section 406(b)." *Id.* at 1260. Rather, attorneys were advised that they must "first utilize the EAJA where it is appropriate and then section 406(b) where it is not." *Id.* at 1260. The court, of course, made clear that "the filing of an EAJA application does not preclude a subsequent filing under section 406(b)." *Id.* at 1260.[18]

*Taylor* made appropriate reference to the recent decisions of the Third Circuit in *Tressler v. Heckler,* 748 F.2d 146 (3d Cir. 1984), and *Washington v. Heckler,* 756 F.2d 959 (3d Cir.1985), to support its view that a district court's denial of attorney's fees under the EAJA on the ground that the Secretary's position was substantially justified would likely be reversed on appeal for the reason that in the decade of the 1980's "the decisions of the Secretary of Health and Human Services are so often lacking in substantial justification, either in fact or for failure to follow well-settled legal precedent. *See generally Wier v.*

---

**18.** The *Taylor* court also made clear that "[f]ailure to seek fees from the governnment, rather than the client, clearly affects both the quality of counsel's performance and the result achieved, particularly if there is a substantial likelihood that the government could be held responsible for the payment of those fees." *Id.,* 608 F.Supp. at 1256.

*Heckler*, 734 F.2d 955, 956–57 (3d Cir. 1984)." [19]

In 1986, Judge Stevens of the Western District of Missouri published his opinion in *Dowdy v. Bowen*, 636 F.Supp. 591 (W.D. Mo.1986), for the reason that "the court wishes to take this opportunity to provide counsel herein and any other attorneys appearing before this court in the future with suggested guidelines for collecting a fee after successful representation of a client in a social security disability matter such as this." 630 F.Supp. at 594. Judge Stevens added that it "would behoove counsel, in the interest of providing the best possible representation of their social security clients, to first attempt to collect their fee award and recover expenses from the United States, rather than from their client's past-due benefits." *Id.* Accordingly, he directed that "in the future, attorneys will timely seek a fee award first under the EAJA, if appropriate and in their clients' best interests. Attorneys may also make application for a fee award by filing alternative motions for fees under 42 U.S.C. § 406(b) and the EAJA, 28 U.S.C. § 2412(d)." [20] *Id.* at 594.

We turn now to but a few of the Courts of Appeals decisions which have considered EAJA awards in Social Security cases.

### C.

*Cornella v. Schweiker*, 728 F.2d 978 (8th Cir.1984), reversed a district court's denial of attorney's fees under the EAJA in a Social Security case. *Cornella* noted that the "district court, in denying attorneys' fees here, stated that since there is some evidence supporting the Secretary's position, the government's position was substantially justified." *Id.* at 983 n. 1. *Cornella* concluded however, that "[t]o the extent that the district court's opinion ... can be read as stating that the substantial justification standard is met whenever the government shows its position was based on *some* evidence as opposed to *no* evidence, their reasoning is unacceptable. Clearly a 'no evidence' standard is not what Congress intended in enacting the EAJA." [21] (Emphasis added). *Id.*

The Secretary in *Cornella*, consistent with the administration's policy that attorney's fees should be paid out of the claim-

---

**19.** *Taylor* quoted that portion of Chief Judge Aldisert's concurring opinion in *Washington* in which it was stated that in the Third Circuit "the bottom line seems to be that we always reverse denials of attorney's fees" under the EAJA. 756 F.2d at 968. Chief Judge Aldisert concurred in the Third Circuit's reversal of the district court's denial of an EAJA attorney's fee award in that case but stated that "based on the bottom line dispositions of this court in Social Security cases, I advocate one single test by which a court may grant attorney's fees to a Social Security claimant on the ground that there was no substantial evidence on the record supporting the Secretary's position. *I would hold as a matter of law that absent truly extraordinary circumstances, in each such case the position of the United States was not substantially justified.*" (Emphasis added). *Id.* at 969. No court has, as yet, gone quite so far as to accept that prophylactic view. The majority in *Washington*, however, conceded that the rule advocated by Chief Judge Aldisert was a desirable one, but concluded that the adoption of such a rule in the Third Circuit was foreclosed by prior Third Circuit opinions illustrated by *Tressler*.

**20.** Judge Stevens' guidelines were, of course, consistent with the general practice followed by all judges who sit in the Western District of

Missouri. *See, e.g.,* the following unpublished opinions of the undersigned judge: *Coppage v. Heckler*, No. 82–0829, April 6, 1984; *Niccoli v. Heckler*, No. 84–0938, Sept. 13, 1985; *Ward v. Bowen*, No. 85–0253, Feb. 28, 1986; *Howell v. Bowen*, No. 85–1319, Oct. 28, 1986; and *Collier v. Bowen*, No. 83–1152, Jan. 28, 1987, in which attorney's fees were awarded under the EAJA rather than Section 406(b), in cases in which the Secretary's decision was reversed outright.

**21.** The *Cornella* court took appropriate notice of the delay occasioned by the Secretary's administration of the Act. It noted that "[d]ue to lengthy delays and continual adverse administrative decisions, it took Cornella approximately three and one-half years from the time he first sought judicial review to the date he finally received a favorable decision." *Id.* at 985.

For a more recent Eighth Circuit case reversing the district court's denial of an award of attorney's fees under the EAJA, *see Wheat v. Heckler*, 763 F.2d 1025 (8th Cir.1985). *See also Granville House, Inc. v. The Department of Health, Education and Welfare*, 813 F.2d 881 (8th Cir.1987), the latest Eighth Circuit case following *Cornella*, in which the Court of Appeals awarded $13,084.00 attorney fees under the EAJA on the ground the HEW actions were not substantially justified.

ant's past-due benefits rather than by the government, contended that the EAJA did not apply to claims filed pursuant to the Social Security Act. *Cornella* held that we "disagree with the contention that the EAJA does not apply to Social Security Act cases" for two reasons. First, *Cornella* stated the Eighth Circuit's agreement with the Fourth Circuit's rejection of the Secretary's argument for the reasons stated in *Guthrie v. Schweiker*, 718 F.2d 104, 107–108 (4th Cir.1983).[22]

Second, and of equal importance, *Cornella* concluded that:

> Moreover, the legislative history of the EAJA indicates that Congress intended the Act to cover civil actions to review decisions of the Secretary. A House Report provides that "[t]here was much discussion whether the United States should be liable when it is a named party and represented in a civil action under the Social Security Act. The Committee decided that civil actions should be covered." H.R.Rep., *supra*, at 12, *reprinted in* 1980 U.S. Code Cong. & Ad. News 4991. We, therefore, hold that the EAJA applies to Social Security Act cases.

728 F.2d at 987.

*Cornella*, of course, discussed the legislative history of the original EAJA, which was enacted in 1980 in response to the Supreme Court's decision in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The original EAJA was due to expire on September 30, 1984. On October 11, 1984 the Congress passed H.R. 5479 which extended and made permanent the substance of the 1980 EAJA. That bill was vetoed by the President on November 9, 1984. The Congress, however, thereafter enacted H.R. 2378 which did no more than slightly modify H.R. 5479. On August 5, 1985, H.R. 2378 was approved by the President and became Public Law 99–80 (99 Stat. 183).

The 1985 EAJA and its legislative history establishes that the Congress did not change its view in regard to the applicability of the EAJA to Social Security cases. Congress expressly provided in Section 3 of the 1985 EAJA that: "Section 206(b) of the Social Security Act (42 U.S.C. 406(b)(1)) shall not prevent an award of fees and other expenses under section 2412(d) of title 28, United States Code." The legislative history of that section states that "Section 3 amends section 206 of the Social Security Act to provide that the existence of an attorney fee provision in the Social Security Act shall not prevent the award of fees under EAJA." H.R.Rep. No. 120, 99th Cong., 1st Sess. 20, *reprinted in* 1985 U.S. Code Cong. & Admin. News 132, 148.

It is thus clear that Congress has consistently expressed its intention in regard to both the 1980 and the 1985 EAJA that the government, rather than the claimant, should be held responsible for the attorney's fees of a successful Social Security claimant in all cases in which it is judicially determined that the Secretary's adverse decision was not substantially justified, or unless special circumstances would make an award unjust.[23] It must be assumed

---

**22.** In footnote 15, *Cornella* noted that its rejection of the Secretary's argument was also in accord with that of two other circuits, citing *Berman v. Schweiker*, 713 F.2d 1290, 1293 (7th Cir.1983); *McGill v. Secretary of Health & Human Services*, 712 F.2d 28, 30 (2d Cir.1983).

**23.** House Report No. 99–120, dated May 15, 1985, stated that the "purpose of the 'Equal Access to Justice Act,' as originally enacted in 1980, was to expand the liability of the United States for attorneys' fees and other expenses in certain administrative proceedings and civil actions. The primary purposes of the Act was to ensure that certain individuals, partnerships, corporations, businesses, associations, or other organizations will not be deterred from seeking review of, or defending against, unjustified gov-

ernmental action because of the expense involved in securing the vindication of their rights. The Act reduces the disparity in resources between individuals, small businesses, and other organizations with limited resources and the Federal Government.... H.R. 2378 will make permanent those provisions of the law which were originally enacted as a three-year experiment, and will provide clarification and other improvements in the Act to ensure that awards are made in appropriate proceedings and cases." 1985 U.S.Code Cong. & Admin. News, 132, 132–133. That report also made clear that "the United States will be liable unless the position of the government—the action or failure to act by the government upon which the administrative proceeding or civil action is

that the Congress was fully cognizant of the impact that application of the EAJA to Social Security cases would have on the federal budget. Indeed, we believe that the Congress intended that the Secretary give appropriate consideration to the same factors in determining the policies under which the Social Security Act is to be administered in the 1980's.

For recent cases from other circuits which reverse district courts' denial of EAJA attorney's fees in Social Security cases, *see Smith v. Heckler*, 739 F.2d 144, 148 (4th Cir.1984) (EAJA attorney's fees were awarded after "a heroic four-year struggle by plaintiff to win her benefits, including two administrative hearings, two appeals, and two court proceedings...."); *Martin v. Heckler*, 754 F.2d 1262 (5th Cir. 1985) ($12,056.25 EAJA fees awarded by the Court of Appeals after its outright reversal of the Secretary's decision in *Martin v. Heckler*, 748 F.2d 1027 (5th Cir. 1984));[24] and *Fulton v. Heckler*, 784 F.2d 348 (10th Cir.1986) (remanding an application for EAJA fees to the district court for the determination of the amount of fees in light of the outright reversal of the Secretary's decision in *Fulton v. Heckler*, 760 F.2d 1052, (10th Cir.1985)).

### D.

We have not, by any means, directed attention to all of the cases which recognize the preferred availability of making attorney's fee awards under the EAJA in Social Security cases. The manner in which recent Secretaries have administered the Social Security Act in the 1980's, their defiance of controlling court decisions, and the litigation track record established by those Secretaries has been so substantially unjustified that we know of no case in which a Court of Appeals has ever reversed a district court's attorney's fee award made under the EAJA.[25]

The Eighth Circuit's decision in *Hillhouse v. Harris*, 715 F.2d 428 (8th Cir.1983) (per curiam), is convincing evidence that judicial patience with the manner in which the Social Security Act has been and is being administered throughout the 1980's has indeed been worn thin. The Eighth Circuit, as have many other courts, has been forced to recognize that the Secretaries of the 1980's, without the mandate or approval of the Congress, have apparently been attempting to balance the federal budget by pursuing policies which deny Social Security claimants the benefits to which they are entitled under applicable law.[26]

---

based, as well as the litigation position—is substantially justified, or unless special circumstances would make an award unjust." *Id.* at 135.

**24.** The Fifth Circuit in *Martin I* expressed concern that "three and one-half years have elapsed since Martin applied for benefits to which he is entitled" and about the fact that "[o]n judicial review, the Secretary has urged the court to uphold the denial of benefits on plainly inapplicable grounds...." 748 F.2d at 1036. The Fifth Circuit concluded that "[t]his scenario, at the least, is not in keeping with the remedial purposes of the disability provisions of the Social Security Act and may in future cases expose the Secretary to liability for costs, attorneys' fees, and other expenses under the Equal Access to Justice Act. *See* 28 U.S.C. § 2412; 5 U.S.C. § 504; *Cornella v. Schweiker*, 728 F.2d 978 (8th Cir.1984)." *Id.* at 1037.

**25.** District court experience with the current flood of currently litigated Social Security cases establishes that the question most frequently presented is not whether the Secretary's decision should be reversed; the closest question is whether the Secretary's decision should be re-

versed outright or reversed and remanded for still further lengthy administrative procedures. In cases subject to outright reversal on lack of substantial evidence grounds, the availability of an attorney's fee award under the EAJA, absent truly exceptional circumstances, is virtually certain. *See* Chief Judge Aldisert's concurring opinion in *Washington v. Heckler*, 756 F.2d at 969.

**26.** In addition to the Eight Circuit cases cited in the text, *see Stieberger v. Heckler*, 615 F.Supp. 1315, 1353 (S.D.N.Y.1985) ("the [Secretary's] non-acquiescene policy has been the subject of almost universal condemnation by those courts which have considered its legality."); *Ass'n of Administrative Law Judges v. Heckler*, 594 F.Supp. 1132, 1138-39 and 1143 (D.D.C.1984) (Secretary's policy of nonacquiescence and practice of applying "Bellmon Review" to ALJs with high allowance rates "created an untenable atmosphere of tension and unfairness"; Court dismissed action because "defendants appear to have shifted their focus, obviating the need for any injunctive relief...."); *W.C. v. Heckler*, 629 F.Supp. 791, 797-800 (W.D.Wash.1985) (Secretary's improper use of "Bellmon review" pressured ALJs to deny disability benefits).

*Hillhouse* noted that "the Secretary continues to operate under the belief that she is not bound by district or circuit court decisions." *Id.* at 430. The Secretary was bluntly advised that she would ignore at her peril the fundamental principle of constitutional law established by *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), in which Chief Justice Marshall stated that "It is, emphatically, the province and duty of the judicial department, to say what the law is." 715 F.2d at 430.[27]

In *Douglas v. Schweiker*, 734 F.2d 399 (8th Cir.1984), decided a year after *Hillhouse*, the Eighth Circuit was required to note that "the Secretary in her brief states that the burden was on Douglas to establish his inability to do light or sedentary work." 734 F.2d at 400. The *Douglas* court, citing numerous Eighth Circuit cases, all decided in the 1980's, flatly stated that "[t]his statement is wrong, and the Secretary knows it is wrong. We have stated time after time after time that when a claimant is unable to work at his former job that the burden shifts to the Secretary to prove that the claimant is able to do light or sedentary work in a competitive work setting." *Id.* at 400.

*Douglas* further noted that the "Secretary has not appealed from our decision on this point in any of the cited cases or in any other cases in which we have so held." It was accordingly concluded that "[t]hus, this view is the law of the Circuit and must be followed in all cases in this Circuit. Administrative law judges must recognize and apply this law in their decisions. *Hillhouse v. Harris*, 715 F.2d 428, 430 (8th Cir.1983)." [28] *See also Layton v. Heckler*, 726 F.2d 440, 442 (8th Cir.1984) ("we shall continue to upset the findings of the Secretary until such time as she sees fit to comply with the decisions of this Court"). Compare the direct confrontation provoked by the Secretary as reported in *Polaski v. Heckler*, 585 F.Supp. 1004 (D.Minn.1984); 739 F.2d 1320 (8th Cir.1984); 751 F.2d 943 (8th Cir.1984); and 804 F.2d 456 (8th Cir. 1986) (decision after remand).

We are in complete agreement with the principles stated in the decisions of the trial and appellate courts that we have cited in regard to the utilization of the EAJA in Social Security cases.[29] Order (3) entered

---

And for typical cases awarding EAJA attorney's fees requiring the government to pay for the Secretary's folly, *see Zimmerman v. Schweiker*, 575 F.Supp. 1436 (E.D.N.Y.1983); *Ward v. Schweiker*, 562 F.Supp. 1173 (W.D.Mo. 1983); and *Velazquez v. Heckler*, 610 F.Supp. 328 (S.D.N.Y.1984).

**27.** Judge McMillian concurred specially in the per curiam opinion in *Hillhouse*. He added, however, that "if the Secretary persists in pursuing her nonacquiescence in this circuit's decisions, I will seek to bring contempt proceedings against the Secretary both in her official and individual capacities." 715 F.2d at 430.

Chief Judge McManus of the Northern District of Iowa actually issued such an order for the Secretary to show cause why she should not be held in contempt. That order was eventually mooted by the *Polaski* settlement. *See In re Heckler*, 751 F.2d 954 (8th Cir.1984).

**28.** In the decade of the 1980's, the undersigned judge has, time after time, either reversed outright or reversed and remanded all except an exceedingly small number of the Secretary's decisions in the large number of Social Security cases that have been processed in the Western District of Missouri. The Clerk's office has advised me that the Secretary has not noticed a single appeal in any of those cases. The Secretary, however, continues to file boilerplate

briefs in case after case which continue to ignore the Eighth Circuit decisions in *Douglas* and the numerous other controlling Eighth Circuit decisions cited in Judge Heaney's Hamline Law Review article cited above.

**29.** The circumstances of this case have required discussion of the duties imposed by law on the attorney for a Social Security claimant. The manner in which the Social Security Act has been administered in recent years has required numerous other courts to define the ethical and procedural duties that are imposed by law on the attorneys that represent the Secretary and to state the consequences of a failure to discharge those duties. *See Alameda v. Secretary of Health, Education & Welfare*, 622 F.2d 1044 (1st Cir.1980); *Gagne v. Heckler*, 613 F.Supp. 360 (D.Me.1985); *Roldan v. Secretary of Health and Human Services*, 612 F.Supp. 1155 (D.Puerto Rico 1985); *Lewis v. Heckler*, 605 F.Supp. 9 (E.D.Ky.1984); *Stanley v. Heckler*, 604 F.Supp. 1102 (D.Mont.1985); *Morton v. Heckler*, 586 F.Supp. 110 (W.D.N.Y.1984); *Zimmerman v. Heckler, supra*, 575 F.Supp. 1436; *Marziliano v. Heckler*, 728 F.2d 151 (2d Cir.1984); *Giampaoli v. Califano*, 628 F.2d 1190 (9th Cir.1980). The New York Times article of September 9, 1984, sec. 1, part 1, p. 38, col. 1, cited by Judge Carter in *Ouellette v. Heckler*, 102 F.R.D. 940 (D.Me. 1984), reported that although the Secretary rec-

in this case on February 19, 1987 accordingly directed Mr. Thornton to show cause why an order should not be entered that would determine whether he was entitled to an attorney's fee award under the EAJA.

Although the response did not specifically address that question, it is both necessary and appropriate that we find and conclude that the discretion vested in this Court should be exercised against the award of any attorney's fee award under the EAJA under the circumstances reflected by the files and records in this case. For the filings made by plaintiff's attorney were of no substantial benefit to the claimant and were of no assistance whatsoever in this Court's determination that the Secretary should be reversed outright.[30]

For the reasons stated, it is

ORDERED (1) that no attorney's fees will be awarded to plaintiff's attorney under either 42 U.S.C. § 406(b) or under 28 U.S.C. § 2412. It is further

ORDERED (2) that the Clerk shall promptly enter final judgment on a separate document pursuant to Rule 58 of the Federal Rules of Civil Procedure in favor of the plaintiff and against the defendant. That final judgment shall further reflect this Court's final order which denies any award of attorney's fees as stated in Order (1) above.

---

ognized that her policies had "produced a 'major crisis in litigation'" which led to a "'huge volume of adverse court decisions,'" the Secretary had no intention of changing those policies. The article also reported that the "United States Attorney for the Southern District of New York has refused to defend the Government in some cases where it is trying to cut off Social Security disability benefits" after he had concluded that the agency's position was "unreasonable and indefensible."

**30.** Judge Haynsworth's observation in *McKittrick* that the "evidence of a lawyer's fidelity and commitment to his client's cause ... is reflected in his performance in court" and his conclusion that "the controlling criterion will remain the quantity and quality of the lawyer's services as observed by the judge in the judicial proceedings," 378 F.2d at 875, is as true in 1987 as it was in 1967.